BILICKI v. STATEN ISLAND SHIPBUILDING CO.

(Supreme Court, Appellate Division, Second Department. December 28, 1911.)

1. MASTER AND SERVANT (§ 278*)—INJURIES TO SERVANT—ACTIONS—EVIDENCE.
In an action by a servant injured while chipping a steel plate with an air gun, evidence held insufficient to show a custom of employers in that line of business to supply servants with appliances to protect their eyes.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954–972; Dec. Dig. § 278.*]

2. MASTER AND SERVANT (§ 105*)—INJURIES TO SERVANT—APPLIANCES—USAGE.
Where a servant had his eye injured while chipping a steel plate with an air gun, the failure of his employer to furnish him with an appliance to protect his eyes was not negligence, where it was not the custom of employers to furnish such appliances, though it was the custom among steel workers to use them.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 185–191; Dec. Dig. § 105.*]

Woodward, J., dissenting.

Appeal from Trial Term, Richmond County.

Action by Thomas Bilicki against the Staten Island Shipbuilding Company. From a judgment for plaintiff and an order denying a new trial, defendant appeals. Reversed and remanded.

Argued before JENKS, P. J., and THOMAS, CARR, WOODWARD, and RICH, JJ.

John J. Kenney, for appellant.
Richard J. Donovan (Herbert D. Cohen, on the brief), for respondent.

THOMAS, J. [1, 2] Plaintiff, defendant's servant, recovered for injury resulting in the loss of his eye from a flying steel shaving,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

while using an air gun for chipping a flange on a boiler head pursuant to an order of defendant's superintendent.

The plaintiff was injured on March 10, 1910, at which time he was about 22 years of age. From his father's business, that of a butcher, he went into the defendant's employment. He testified that his duties required helping around the shop, in the matters of cleaning, rigging, putting up machinery, errands, getting material, tools, aiding boilermakers, drawing out and replacing tubes, drilling holes, connecting hose, holding lights. He did what would be demanded of a young man of progressing experience in the varieties of work for which the shop was used. Some three or four months before the accident he had for a half hour used the air gun for chipping a relatively small plate. But at the time in question he was without further instruction directed by the superintendent to use the air gun to chip or to shave off that part of a steel boiler head, laid down on barrels, as indicated by a varying chalk line. The court submitted to the jury only one question relating to defendant's negligence, as follows:

"Summing this up, you cannot charge the defendant here with negligence because of the flying particle unless you are satisfied: First, that, in the ordinary progress of that work, that might reasonably be expected to happen at intervals; secondly, that that had so frequently happened that the attention of employers and those engaged in the same line of boilermaking had been called to it, and that reasonable men had considered the matter and had provided some kind of appliance for the protection of workmen. You must go further, even, and find that some such appliance had been in common and ordinary use in boiler shops by men who were not in the boiler room alone, but by men who, in the boiler room, were engaged upon precisely the same work that the plaintiff was engaged upon when the accident happened. If you find, under this charge, that there was such common and ordinary use of an appliance for protecting workmen, then, if the defendant failed to furnish that appliance, the defendant would be negligent."

The appliance to which the charge refers was goggles with protecting wire sides and with a front of some material through which the operator could see. The plaintiff's evidence tended to show goggles in use in some other places of two kinds: (1) Those with glass fronts and wire sides; (2) those with wire fronts and sides, or isinglass fronts and wire sides. The plaintiff's witness Gallagher testifies to the use in some places, elsewhere than in defendant's shop, of glasses of the first class, like the usual automobile glasses, while plaintiff's witness Morris testified to such use of glasses of the second class. But Morris testified that a glass of the first class was "more dangerous than the entire absence of goggles if a chip would hit it" in steel work, although it was used on stone work. Plaintiff's witness Meehan testified that he had seen in places named by him, for heavy chipping, the use of goggles in the automobile shape but with wire or isinglass fronts, but indicated that for light chipping the operator took the risk. De Wolf testified that he had seen goggles used where "air hammers were being used on steel plates or flanges in all places," but he had never seen glass goggles in work upon iron, and regarded them as extremely dangerous therefor, but added that "it is common and general for men trimming off steel

with a chisel and striking hammer to use" the wire goggles. The defendant's witnesses gave testimony tending to show that protecting glasses were not used, or only used in clipping substances that might give off disintegrated or foreign material, and not new steel. The witness Gallagher adds no useful information. The others called by plaintiff show the use of glasses in certain places—but at whose instance does not appear. So far as the evidence indicates, the use of glasses is not under a rule furnished or a practice maintained by the employer; nor does it appear that the master provided the protection. At the Navy Yard, instanced by Meehan, the operator purchases his own goggles. But the court charged that, if the jury found that there was such common and ordinary use of an appliance for protecting workmen, the defendant's failure to supply it to the plaintiff would be negligent.

Passing the propriety of leaving to the jury the question of negligence, even if such common use were found, I consider the case deficient, in this, that it does not appear sufficiently, if at all, that such common use was at the instance of the master, and that he supplied the protecting appliance. If it were the mere practice of the individual operator, then the duty would not fall on the master. In the present case the question submitted to the jury was not whether the superintendent negligently placed an inexperienced man at an employment dangerous beyond the servant's knowledge, if such was the case, without warning and without supplying or suggesting means to guard against the danger. The learned justice did call attention to the plaintiff's experience and opportunities for knowledge, but explicitly withdrew from the jury whether instructions or warning should have been given, but made available to him only the protection that was due his fellow servants, viz., to be furnished by the master at the peril of its liability what was in common use for protecting workmen similarly engaged. It may be that if a master puts an inexperienced man, without furnishing protection, to chipping steel with an air gun cutting rapidly, whereby there is danger of the shavings flying back into his eye, the master, if in the exercise of ordinary skill and knowledge should apprehend the result, should warn or instruct the servant, if there is reasonable probability of his ignorance of the danger, to the end that he may decline the task, or may do it with greater caution or knowledge, or obtain practical means for guarding himself. But such question is not before the court. The present decision is based upon failure to prove that wearing protective glasses elsewhere than in defendant's business does not show the master negligent, where, so far as appears, the operators in other places may be alone responsible for the practice.

The judgment and order denying the motion for a new trial should be reversed, and a new trial granted; costs to abide the event. All concur, except WOODWARD, J., who dissents.